## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CALVIN BERNARD JEFFERSON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-471** |
| **DARREL VANNOY, WARDEN** | **SECTION: "H"(5)** |

### <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Calvin Bernard Jefferson, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    In June 2012, he was indicted for second-degree murder.[1]    Several days into trial, on June 9, 2017, he withdrew his plea of not guilty and entered an *Alford* plea, over the State's objection, to second-degree murder.[2]    He was

---

[1]  State Rec., Vol. 1 of 13, Grand Jury Indictment, St. Tammany Parish.

[2]  State Rec., Vol. 1 of 13, Minute Entry, 6/9/2017.    He entered the plea pursuant to *North Carolina v Alford*, 400 U.S. 25 (1970), and was allowed to plead guilty while maintaining his innocence, reserving his right to appeal adverse pretrial rulings under *State v. Crosby*, 338 So.2d 584 (La. 1976).

sentenced to life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence.

Jefferson appealed asserting one assignment of error.    He argued that the trial court erred in denying his motion to suppress the statements he made after he advised officers that he had counsel.    On September 24, 2018, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[3]    On February 25, 2019, the Louisiana Supreme Court denied his application for writ of certiorari.[4]

On or about September 6, 2019, Jefferson submitted an application for post-conviction relief to the state district court.[5]    In that application, he raised two grounds for relief:    (1) his guilty plea was not voluntarily, intelligently or knowingly entered; and (2) he was denied the effective assistance of counsel during plea negotiations.    On October 28, 2019, the state district court denied relief on the merits.[6]    On February 18, 2020, the Louisiana First Circuit denied his supervisory writ application.[7]    On October 20, 2020, the Louisiana Supreme Court denied relief.[8]    The Court determined that he failed to show that

---

[3] *State v. Jefferson*, 2018-KA-0083 (La. App. 1 Cir. 9/24/18), 261 So.3d 793; State Rec., Vol. 11 of 13.

[4] *State v. Jefferson*, 2018-KO-1671 (La. 2019), 266 So.3d 294; State Rec., Vol. 10 of 13.

[5] State Rec., Vol. 11 of 13, Uniform Application for Post-Conviction Relief and Memorandum in Support.

[6] State Rec., Vol. 11 of 13, State District Court Judgment on Post-Conviction with Incorporated Reasons, 10/28/2019.

[7] *State v. Jefferson*, 2019-KW-1558, 2020 WL 789012 (La. App. 1 Cir. Feb. 18, 2020), State Rec., Vol. 12 of 13.

[8] *State v. Jefferson*, 2020-KH-00656 (La. 10/20/20), 303 So.3d 300; State Rec., Vol. 13 of 13.

he was denied the effective assistance of counsel during plea negotiations under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984), and he failed to satisfy his burden of proof as to the remaining claims.

On March 3, 2021, Jefferson filed the instant federal application for habeas corpus relief.[9]    In that application, he raises three claims for federal relief:    (1) the trial court erred in denying the motion to suppress his statement; (2) his guilty plea was not voluntarily, intelligently or knowingly entered; and (3) he was denied the effective assistance of counsel during plea negotiations.    The State concedes that the federal petition was timely filed and the claims have been exhausted in the state courts.[10]    Jefferson filed a reply to the State's response.[11]

### Facts

On direct appeal, the appellate court set forth the following pertinent facts:

> At the *Boykin* hearing, for the factual basis for the *Alford* plea, the prosecutor stated that if the trial were continued to verdict, "the State would present all evidence that was told to the jury in opening statement from all witnesses going forward and would present everything that I said in opening statement." The trial court added that "the Court can certainly take judicial notice of the testimony and evidence solicited thus far."[12]    The pertinent parts of the State's opening statement were as follows: Nicole Jefferson lived in Green Leaves Subdivision in Mandeville with her four children and the defendant, her ex-husband. Nicole worked and needed the defendant's help with the children.

---

[9]  Rec. Docs. 1, 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

[10]  Rec. Doc. 9, State's Response, p. 6.

[11]  Rec. Doc. 10, Reply.

[12]  The defendant states in brief that he withdrew his not guilty plea and entered a guilty plea after opening statements, but before any witnesses were sworn; however, we note that 10 witnesses testified at trial before the defendant sought to change his not guilty plea. In his opening statement, the prosecutor informed the jury the State anticipated calling between 30 and 40 witnesses.

Their twelve-year relationship was marred with the defendant perpetrating acts of domestic violence on Nicole. On the night of April 29, 2012, Nicole went missing. A week later, on May 6, her partially decomposed body was found in a wooded area off of I-12 (near La. Hwy 21). Her head had been severed. The defendant killed Nicole on April 29, 2012, then later that night drove to Wal-Mart and bought ammonia. He put her body in Nicole's van and dumped her in the woods. He then drove to a carwash and cleaned the van.[13]

## Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have

---

[13]  *State v. Jefferson*, 261 So.3d at 795 (footnote in original).

independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.    *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).    An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case."    *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 572 U.S. 415, 426 (2014).

It is well-established that "an unreasonable application is different from an incorrect one."    *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Id.* (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable

decisions of state courts.").

## Analysis

A. *Denial of motion to suppress statements*

Jefferson claims that the state court erred in denying the defense motion to suppress his statements, which were elicited after he had invoked his right to have counsel present during questioning, and absent a valid waiver of his *Miranda* rights.    On direct appeal, the Louisiana First Circuit denied the claim, holding:

> In his sole assignment of error, the defendant argues that the trial court erred in denying his motion to suppress his statement. Specifically, the defendant contends he made a statement after invoking his right to counsel.
>
> The defendant argues in brief that on two occasions, his right to counsel was violated. The defendant avers that after he told Sergeant Alvin Hotard, with the St. Tammany Parish Sheriff's Office, that he had an attorney, Detective Jerry McDowell with the St. Tammany Parish Sheriff's Office had a discussion with him thereby violating his right to counsel. Then, according to the defendant, after the booking process at the Calcasieu Parish Sheriff's Office, he stated he had a lawyer, "thereby [in]voking his right to counsel again." The defendant claims the detectives from St. Tammany were in the room and should have heard this request, but they interviewed him, anyway. As such, according to the defendant, Sergeant Hotard and Detective McDowell again violated his right to counsel.
>
> As to the events that transpired at the Calcasieu Parish Sheriff's Office, the defendant suggests in brief that Detective McDowell did not know the defendant had asked for an attorney when the detective entered the warrants office where the defendant was being booked because it "was an opportunity for him to talk to me." This, according to the defendant in brief, was the first violation of his right to counsel. The defendant then suggests in brief that "Deputy Price" (actually, Lieutenant (now Captain) Raymond Price, with the Calcasieu Parish Sheriff's Office) testified that, after the booking process, the defendant stated that he had a lawyer, "thereby invoking his right to counsel again." According to the defendant, the St. Tammany detectives were in the room when the defendant asked for this attorney this "second time" and, "absent some extraordinary circumstance, they would have heard his request."
>
> We note, however, that the defendant's informing Sergeant Hotard that he had an attorney (on May 8, 2012) was the *first* time the defendant had made this

known. The second time the defendant said he had an attorney was after the detectives interviewed the defendant, left the Calcasieu Parish Sheriff's Office for the evening, then returned to Lake Charles because they were informed the defendant had made a statement to an officer at the Calcasieu Parish Sheriff's Office. When they approached the defendant for the second time in Lake Charles (the next day), at that time the defendant said he had an attorney. The detectives, accordingly, did not talk to the defendant.

As further discussed below, the source of confusion for the defendant is apparently the mistaken belief that the defendant's informing Sergeant Hotard that he had an attorney was a separate event from the occasion when Captain Price heard the defendant say he had an attorney. The defendant suggests that when he arrived at the Calcasieu Parish Sheriff's Office, prior to the booking process, he told Sergeant Hotard he had an attorney; and then *after* the booking process, the defendant again said he had an attorney. But the time Sergeant Hotard first spoke to the defendant and was told he had an attorney was *during* the booking process, the same time that Captain Price heard the defendant say he had an attorney.

Here, the motion to suppress hearing was split up over a large amount of time. That is, the first part of the motion to suppress hearing was conducted on September 17, 2014, with witnesses Sergeant Danel Griffin, Jr, with the Calcasieu Parish Sheriff's Office, and Captain Price. The hearing was then held open, and the second part was conducted on March 31, 2016, with witnesses Sergeant Hotard and Detective McDowell. Further, by the time the second part of the motion to suppress hearing was held, all of the attorneys for both the State and defense for the first part of the hearing had been replaced with different counsel.

The testimony adduced at the motion to suppress hearing shows the following events. On May 8, 2012, the defendant, who was in Lake Charles, went to the Calcasieu Parish Sheriff's Office because of an outstanding second degree murder warrant for his arrest. Sergeant Griffin, who worked the warrants and fugitive recovery unit of the Sheriff's Office, testified that he **Mirandized** the defendant and placed him in the warrants office (or warrant room). The defendant did not ask for an attorney. He waited with the defendant until the detectives from St. Tammany Parish arrived. The defendant was then brought to an interview room, and while the detectives spoke to the defendant, Sergeant Griffin remained in the interview room to provide security.

Captain Price testified the defendant turned himself in at the Calcasieu Parish Sheriff's Office. He and Sergeant Griffin brought the defendant to the warrants division. According to Captain Price, he heard Sergeant Griffin **Mirandize** the defendant. Subsequently, the detectives from St. Tammany Parish arrived. At one point when the defendant was in the warrant room, Captain Price heard the defendant say that he had an attorney.

Sergeant Hotard testified that when he made contact with the defendant at the Calcasieu Parish Sheriff's Office, the defendant told him he had an attorney and did not want to talk to anyone. Sergeant Hotard obliged the defendant and he was placed in a warrant room, which was in effect, an office. Sergeant Hotard noted there was another Calcasieu Parish Sheriff's Office official there to do booking paperwork. The defendant had to be booked into jail in Calcasieu Parish as a fugitive on a fugitive warrant so that he could then be properly transported back to St. Tammany Parish. Sergeant Hotard left the room to contact his superior; he left the defendant in the room with Detective McDowell. When Sergeant Hotard returned to the room, Detective McDowell, in front of the defendant, told Sergeant Hotard that the defendant began speaking to him (Detective McDowell), that the defendant had said he was upset with his attorney, and that at this point he wanted to talk. Before being interviewed, the detectives went outside with the defendant so he could smoke a cigarette. Neither detective asked the defendant about the case. They then took the defendant to an interview room and **Mirandized** him again. The defendant signed the waiver form and gave a recorded interview. During this time, the defendant never asked for an attorney. The detectives terminated the interview when the defendant said he did not want to talk anymore. The detectives then left and, according to Sergeant Hotard, they returned to the Calcasieu Parish Sheriff's Office the following morning because they were informed the defendant had made a statement to Lieutenant Boyd Price of the Sheriff's Office, and they wanted to talk to the defendant about what he told Lieutenant Price. When Sergeant Hotard and Detective McDowell arrived, the defendant told them he was not going to talk to them, and that he had an attorney. Accordingly, they did not talk to the defendant.

Detective McDowell testified that he was in the warrant room ("warrants division room") with the defendant and Sergeant Griffin, where the defendant was undergoing the booking process. Sergeant Hotard was out of the room, making contact with their St. Tammany Office. Detective McDowell testified that he had not been aware that the defendant had told Sergeant Hotard that he had an attorney. According to Detective McDowell, he was in that room with the defendant because Sergeant Griffin had been the only other officer in the room. It was near the end of the booking process when the defendant began to speak to Detective McDowell. According to Detective McDowell, the defendant spoke to him about family members who were in Lake Charles. They never discussed anything about the investigation. According to Detective McDowell, after he spoke about his family, the defendant then "basically said he wanted to cancel his attorney and wanted to talk." Detective McDowell testified, "I basically asked him, 'Are you sure you want to talk to us?' And he said yes." Sergeant Hotard returned to the room shortly thereafter, and Detective McDowell told the sergeant what the defendant had just told him. The defendant heard what Detective McDowell told Sergeant Hotard about the defendant waiving his attorney and, according to the detective, the defendant

"seemed very cooperative at that time," and "it appeared that he wanted to talk to us." Before the interview, the defendant went outside to smoke a cigarette. The defendant was then brought to an interview room, **Mirandized** again, and interviewed.

In denying the motion to suppress the statement, the trial court ruled as following [sic]:

I had taken that under advisement on March 31st and was provided with I think it's a total of seven disks along with the associated **Boykin** forms which had been introduced into evidence at the prior hearing date. There were two prior hearing dates. One was September 17, 2014 and the other was the March 31, 2016 dates.

Mr. Linder: You mentioned **Boykin** forms?

The court: I'm sorry, **Miranda** forms. My error, I misspoke. That's not what I meant to say. I don't know why I said **Boykin** forms. It's the **Miranda** forms that were associated with each of those two interviews. One occurred on May 2, 2012 and the other one was on the, or simultaneously with the arrest of Mr. Jefferson on May 8th of 2012.

I had the opportunity and watched all of the videos related to the May 2, 2012 statements. I had some technical difficulties with the May 8th recordings and asked for both the defense counsel and the State to assist me and we had that conference to help me review the audio video recordings from the 8th.

Of important note in reviewing the history and the testimony of the witnesses in the motion to suppress I was of particular interest to see Mr. Jefferson's demeanor when he was again placed under video audio surveillance and provided with this **Miranda** form to try to make some sense of the inconsistencies in the testimonies. Although there were several inconsistencies about when Mr. Jefferson invoked his right to counsel, it was undisputed that he did invoke his right to counsel. The question in my mind was what then prompted the May 8th statement and who initiated the initial contact to them for him to give them that statement and was it knowingly and voluntarily made knowingly, knowing that he was intelligently waiving his right to counsel after he had in fact invoked his right to counsel.

It was, I believe, Officer McDowell, who had indicated through the process of Mr. Jefferson being booked that after having some small talk, more likely relevant to Mr. Jefferson's family, both here in St. Tammany and down in the Calcasieu Parish area, then Mr. Jefferson according to Mr. McDowell made a comment to the effect that he wanted to cancel his attorney and wished to talk to the officers.

Without being 100 percent sure of exactly what was said and when it was said, in looking at the totality of the circumstances and again I look back at the demeanor of Mr. Jefferson when he is placed under audio and video surveillance to see if he appeared to be under any form of duress, coercions as an attempt to get him to make a statement and I don't note any in that recording, It looks like he is fairly comfortable.

He had already been provided that **Miranda** form once before. He acknowledged that he understood it was the same form. The officers went through it with him. He again initiated or signed it both acknowledging his familiarity with the forms as well as the waiver of the form and then proceeded to give a statement. And I did not look to the entirety of the statement.

Basically after the point of the reading of the **Miranda** form to him and his acknowledgment and waiver of same, I discontinued watching the tape at that point because that was the relevant issue at that point was did he truly, knowingly waive his right to counsel and did the State in any way violate his right to counsel by continuing to initiate communication with him with any intent to coerce a confession from him.

With all that said the Court finds that the statement was freely and knowingly made. The State did not violate his right to counsel and the Court going to deny the motion to suppress.

When a court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the court's discretion, i.e., unless such ruling is not supported by the evidence. See **State v. Green**, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-81. However, a court's legal findings are subject to a *de novo* standard of review. See **State v. Hunt**, 09-1589 (La. 12/1/09), 25 So.3d 746, 751. In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. **State v. Chopin**, 372 So.2d 1222, 1223 n. 2 (La. 1979).

In **Miranda v. Arizona**, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court found that if a suspect indicates "in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." **Edwards v. Arizona**, 451 U.S. 477, 481-85, 101 S.Ct. 1880, 1883-85, 68 L.Ed.2d 378 (1981), reconfirmed these views and, to lend them substance, held that when an accused either before or during interrogation asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated, custodial interrogation, even if he has been advised of his rights. The accused is not subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further

communication, exchanges, or conversations with the police. **Edwards**, 451 U.S. at 484-85, 101 S.Ct. at 1885; <u>see</u> **Maryland v. Shatzer**, 559 U.S. 98, 103-05, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010). **State v. Winfrey**, 12-0940 (La. App. 1 Cir. 2/15/13), 2013 WL 595671 at *5 (unpublished), <u>writ denied</u>, 13-0585 (La. 10/4/13), 122 So.3d 1014.

When a defendant invokes his **Miranda** right to counsel, the admissibility of his subsequent confessions under federal law is to be determined by a two-step analysis: it first must be asked whether the defendant "initiated" further conversation; and if the answer is yes, it must be inquired whether the defendant waived his right to counsel and to silence, that is, whether the purported waiver was knowing and intelligent under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities. **State v. Abadie**, 612 So.2d 1, 5 (La.), <u>cert. denied</u>, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993). **Winfrey**, 2013 WL 595671 at *5.

The Sixth Amendment right to counsel does not attach prior to the initiation of adversary judicial criminal proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. **State v. Carter**, 94-2859 (La. 11/27/95), 664 So.2d 367, 372. Further, the right to counsel exists only during those post-attachment, pretrial confrontations which can be considered "critical stages." A critical stage has been described as a critical pretrial confrontation where the results might well settle the accused's fate and reduce the trial to a mere formality. It has also been described as a pretrial proceeding where the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by both. **Carter**, 664 So.2d at 373. The right to counsel under Louisiana Constitution, Article I, § 13 and the right to counsel under the Sixth Amendment are coextensive in scope, operation, and application. **Carter**, 664 So.2d at 382; **Winfrey**, 2013 WL 595671 at *5.

Our precedents place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. The defendant may waive the right whether or not he is already represented by counsel; the decision to. waive need not itself be counseled. **Michigan v. Harvey**, 494 U.S. 344, 352-353, 110 S.Ct. 1176, 1182-83, 108 L.Ed.2d 293 (1990). <u>See</u> **Montejo v. Louisiana**, 556 U.S. 778, 786, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009).

Under the once bright-line, prophylactic rule of **Michigan v. Jackson**, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), <u>overruled</u>, **Montejo**, 556 U.S. at 797, 129 S.Ct. at 2091, once a defendant's right to counsel had attached, if he made an assertion or invocation of this right, any waiver he would later make in response to police-initiated interrogation would be considered invalid, regardless of whether the waiver would normally meet the standards of a knowing, intelligent and voluntary waiver. <u>See</u> **Carter**, 664 So.2d at 383. As

noted, however, **Michigan v. Jackson** has been overruled. <u>See</u> **Winfrey**, 2013 WL 595671 at *6.

Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will. To hold that a defendant is inherently incapable of relinquishing his right to counsel once it is invoked would be "to imprison a man in his privileges and call it the Constitution." **Adams v. United States ex rel. McCann**, 317 U.S. 269, 280, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). <u>See</u> **Carter**, 664 So.2d at 378.

Based on the foregoing, we see no reason to disturb the trial court's denial of the motion to suppress the defendant's statement. The defendant indicated to Sergeant Hotard that he had an attorney and, accordingly, Sergeant Hotard did not question the defendant. The defendant was placed in a room with Detective McDowell for about five minutes without the presence of Sergeant Hotard. While Detective McDowell was initially unaware the defendant had told Sergeant Hotard he had an attorney, Detective McDowell never spoke to the defendant or questioned him in any way about his case. According to Detective McDowell, the defendant initiated the conversation and spoke to him about the defendant's family in the area. The defendant then specifically informed Detective McDowell that he wanted to "cancel" his attorney and that he wanted to talk to the detectives. Detective McDowell then obtained an assurance from the defendant that talking to them was what he wanted to do. Herein, the defendant exercised his right to an attorney. This right was honored and no police officer spoke to the defendant or questioned him about the case. Afterward, the defendant, under his own volition, initiated contact with the police and specifically made it known that he wanted to talk to the police and that he no longer wanted an attorney. Under the totality of the circumstances, the defendant voluntarily, knowingly, and intelligently waived his right to counsel (and silence) and, as such, the trial court did not err or abuse its discretion in denying the motion to suppress the statement. <u>See</u> **State v. Tilley**, 99-0569 (La. 7/6/00), 767 So.2d 6, 11-12, <u>cert. denied</u>, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). <u>See also</u> **State v. Hobley**, 98-2460 (La. 12/15/99), 752 So.2d 771, 787-89, <u>cert. denied</u>, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000); **State v. Reynolds**, 45,674 (La. App. 2 Cir. 11/3/10), 55 So.3d 136, 140-42; **State v. Williams**, 42,312 (La. App. 2 Cir. 8/15/07), 965 So.2d 541, 556-59, <u>writ denied</u>, 07-2158 (La. 4/18/08), 978 So.2d 347; **State v. Carr**, 530 So.2d 579, 586-89 (La. App. 1 Cir.), <u>writ denied</u>, 533 So.2d 354 (La. 1988), <u>cert. denied</u>, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989).

The assignment of error is without merit.[14]

---

[14] *State v. Jefferson*, 261 So.3d at 795-800.

The Louisiana Supreme Court denied his related writ application without assigning additional reasons.

Where, as here, the claims were denied on the merits in state court, a federal habeas court must apply the AEDPA's deferential standards of review as follows:

> Whether a confession is voluntary is ultimately a legal question, which sometimes involves subsidiary mixed issues of law and fact, and accordingly, we review it under Section 2254(d)(1). *See Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998). Any purely factual sub-questions are presumed correct, unless shown to be unreasonable determinations of fact by clear and convincing evidence. *See id.*; 28 U.S.C. § 2254(d)(2), (e)(1). To determine voluntariness, we consider the "totality of the circumstances." *Rogers v. Quarterman*, 555 F.3d 483, 491 (5th Cir. 2009). "A statement is involuntary if there existed official, coercive conduct that made it unlikely the statement was a product of the individual's free choice." *Id.*

*Davila v. Davis*, 650 F. App'x 860, 871 (5th Cir. 2016), *aff'd*, 137 S. Ct. 2058 (2017).    In this case, the state-court determination that Jefferson knowingly, voluntarily and intelligently waived his right to counsel after invoking it and executed a valid waiver of his *Miranda* rights before making the statements was neither contrary to nor an unreasonable application of United States Supreme Court law.[15]

In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."    *Miranda*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d

---

[15] To the extent Jefferson may question whether his statements were properly admitted under state law (Rec. Doc. 3, p. 26), that claim is not cognizable on federal habeas review.    *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law).    Habeas corpus review is limited to questions of constitutional dimension and federal courts generally do not review the admissibility of evidence under state law.    *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Gonzales v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011); *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992).

694 (1966).    Custodial interrogation consists of questioning by law enforcement agents "after a person has been taken into custody."    *Id*.    The "term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect."    *Rhode Island v. Innis*, 446 U.S. 291, 300-301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).    An incriminating response is "any response – whether inculpatory or exculpatory – that the prosecution may seek to introduce at trial."    *Id*. at 301 n. 5.

Once a suspect invokes his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."    *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).    An accused is considered to initiate the conversation if their statement indicates a "desire ... to open up a more generalized discussion relating directly or indirectly to the investigation."    *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

"After initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation."    *Edwards*, 451 U.S. at 484-85; *see also North Carolina v. Butler*, 441 U.S. 369, 372–76, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).    Any waiver must be "knowing and voluntary," *Butler*, 441 U.S. at 373, 99 S.Ct. 1755, and when the defendant files a motion to suppress a statement that was allegedly made in contravention of his *Miranda* rights, the State bears the burden of proving by a preponderance of the evidence that the defendant's waiver was made voluntarily, knowingly, and intelligently. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).    A suspect's response to further police-initiated custodial interrogation and subsequent waiver

instigated by authorities is not a constitutionally permissible or valid waiver of rights. *Edwards*, 451 U.S. at 484.

Furthermore, notwithstanding the waiver of *Miranda* rights prior to questioning, it is well-established that a suspect retains the right to cut off questioning at any time by invoking his right to remain silent or his right to an attorney.    *See Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (noting that officers must "scrupulously honor" a suspect's "right to cut off questioning").    In order to invoke these rights, a suspect is required to make an unambiguous and unequivocal statement that he intended to do so. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).

The procedural history and factual summary of the testimony adduced during the suppression hearing was set forth by the state appellate court and is reproduced above in its entirety.    Briefly, the motion to suppress hearing was held on September 17, 2014 and March 31, 2016.    Initially the trial court heard testimony from two Calcasieu Parish officers, Sergeant Griffin and Captain Price and, during the later proceeding, from the two St. Tammany Parish officers, Sergeant Hotard and Detective McDowell.    The motion involved a May 8, 2012 interview conducted by the St. Tammany Parish detectives after Jefferson voluntarily turned himself into Calcasieu Parish authorities in Lake Charles, and an oral statement Jefferson made in the presence of Sergeant Griffin and Captain Price after his May 8 interview. [16]    The defense argued that none of the statements made after Jefferson

---

[16]    *See* State Rec., Vol. 1 of 13, Motion to Suppress; Vol. 2 of 13 (R.pp. 355-64), Memoranda in Support and Opposition to Motion to Suppress; State Rec., Vol. 4 of 13 (Transcript of Ruling on Motion to Suppress, August 22, 2016), pp. 797-803; State Rec., Vol. 5 of 13, Trial Transcript, pp. 1108-1114.

invoked his right to counsel were admissible.[17]

Sergeant Griffin testified that he read Jefferson his *Miranda* rights when he was taken into custody.    At this time, Jefferson did not ask for an attorney.    Sergeant Griffin testified that he sat and waited with Jefferson in the warrants division office until the other detectives came into the room and started talking to Jefferson.    Sergeant Griffin said that he was mainly focused on other work.

Sergeant Hotard and Captain Price testified that they each heard Jefferson say he had an attorney and did not want to talk.    Sergeant Hotard testified that he was there when Jefferson turned himself in to Calcasieu Parish authorities, and he explained to Jefferson that he was under arrest.    Jefferson told him that he had an attorney and did not want to talk to anyone.[18]    Sergeant Hotard testified that Jefferson was placed in the warrants office (described as a "bull pen with desks and stuff"), with a Calcasieu Parish officer, who was going to be doing the booking paperwork.    Sergeant Hotard left the room to call his superior officer.

Captain Price was with Sergeant Griffin when he read Jefferson his *Miranda* rights. He was still in the warrants division office when the St. Tammany Parish officers came into the room.    When he was in the room with Jefferson, Captain Price heard Jefferson say that he wanted his attorney.    He "guessed" that this occurred maybe within 30 minutes of Jefferson arriving at the police station, and during the time he was in the warrants division

---

[17] Jefferson does not appear to contest the circumstances surrounding the spontaneous oral statement he made to Calcasieu Parish detectives following his formal interview.    The record confirms that it was not prompted by officers and no questioning followed the interview after Jefferson chose to end it.

[18] State Rec., Vol. 3 of 13, Suppression Hearing (March 31, 2016), p. 747, 763-64.

office with Sergeant Griffin, who he believes was filling out the booking report, and the other two St. Tammany Parish officers.[19]

The record does not support Jefferson's version that he requested a lawyer twice, once before booking and once after he was booked, and that each time he did so, detectives ignored him and violated his right to counsel.[20]   Upon reviewing the testimony from the bifurcated suppression hearing, the state appellate court reconciled that both times Jefferson mentioned having an attorney was during the booking process, while in the warrants office, and before Jefferson had the conversation with Detective McDowell where he stated he wanted to cancel the attorney and talk to officers.[21]   The four officers gave consistent testimony that aside from routine booking questions, at that point, after he had invoked his right to counsel, no one questioned him.

In this case, the initial question as to Jefferson invoking the right to counsel was resolved easily and in the affirmative despite minor discrepancies over exactly when he mentioned he had an attorney.   The state trial court found that after Jefferson was advised of his *Miranda* rights, he unambiguously invoked his right to an attorney.[22]   The State does not dispute that Jefferson unequivocally invoked his right to counsel following his arrest. Even on direct appeal, that issue was not contested.[23]   Because there is no dispute over

---

[19]   State Rec., Vol. 3 of 13, Suppression Hearing (September 17, 2014), pp. 672, 675-76, 681-82.

[20]   Rec. Doc. 3, p. 23.

[21]   *State v. Jefferson*, 261 So.3d at 796.

[22]   State Rec., Vol. 4 of 13, Ruling on Motion to Suppress, pp. 794-95.

[23]   State Rec., Vol. 9 of 13, Appellee Brief, p. 12.

Jefferson invoking his right to counsel, the next question is whether Jefferson thereafter voluntarily reinitiated conversation with officers. This issue, along with the voluntariness of his later executed *Miranda* waiver, were contested in the state courts and resolved against Jefferson in finding no constitutional violation under *Edwards* and a valid *Miranda* waiver.

Jefferson argues that officers did not honor his request for an attorney and to remain silent. He points to Detective McDowell's admission that he was initially unaware that Jefferson had asked for his attorney during his conversation with Jefferson, contrary to Captain Price's testimony that he heard Jefferson say he wanted his attorney when Detective McDowell was also in the room and would assume the other officers heard it too. As further support for his position, he points out that Captain Price admitted he continued to arrange for an interview room even after Jefferson invoked his right to an attorney.[24] According to Jefferson, these factors should have compelled a finding that officers ignored the invocation of his right to counsel.

Generally, once a suspect invokes his right to counsel, interrogation should cease until an attorney is made available *unless* the suspect himself reinitiates communication with officers, and, as here, indicates that he has changed his mind, does not want his attorney present, and wants to talk to officers. *Edwards*, 451 U.S. at 484-85. The trial court reasonably found, as the state appellate court held, that after he invoked his right to an attorney, Jefferson reinitiated conversation with Detective McDowell and revoked his right to counsel. It was Jefferson who voluntarily initiated general conversation about his family with Detective McDowell, who was sitting in the warrants office while Jefferson was being

---

[24] Rec. Doc. 3, Petition, p. 23.

booked.[25]   Jefferson then expressed dissatisfaction with his counsel, who evidently advised him to leave St. Tammany Parish, and told Detective McDowell he wanted to cancel his attorney and talk to detectives.    At no point did Detective McDowell attempt to question Jefferson or solicit a retraction of his invocation of counsel.    The trial court credited Detective McDowell's testimony.    None of the officers contradicted McDowell's testimony about what Jefferson said to him in the warrants office.    In fact, Detective McDowell's testimony was supported by Sergeant Hotard's account that when he returned to the warrants division room after stepping out briefly, Detective McDowell told him that Jefferson had initiated small talk with him, said he was upset with his attorney, and wanted to talk to them, all in front of Jefferson, who did not refute it.[26]    Here, Jefferson independently reinitiated conversation and changed his mind about remaining silent and wanting counsel. *Arizona v. Roberson*, 486 U.S. 675, 678-82 (1988); *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983).    Detective McDowell confirmed with Jefferson that he did indeed want to proceed without his attorney and talk to them.[27]    Furthermore, at this point, neither Detective McDowell nor Sergeant Hotard asked him any questions related to the investigation.    Under these circumstances, the state-court reasonably determined that the interaction did not violate the *Edwards* rule.

Additionally, the state court of appeal correctly considered the distinct additional question as to whether Jefferson made an intelligent, knowing and voluntary waiver of his

---

[25]   State Rec., Vol. 3 of 13, Suppression Hearing (March 31, 2016), pp. 774-76.

[26]   State Rec., Vol. 3 of 13, Suppression Hearing (March 31, 2016), pp. 747-48.

[27]   State Rec., Vol. 3 of 13, Suppression Hearing (March 31, 2016), p. 775.

rights under *Miranda* considering the totality of the circumstances, "including the necessary fact that the accused, not the police, reopened the dialogue with the authorities."    *See Bradshaw*, 462 U.S. at 1046 (quoting *Edwards*, 451 U.S., at 486 n. 9).    "[T]his determination depends 'upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused.' "    *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979)).    Here, the state court reasonably concluded that his *Miranda* waiver was knowing, intelligent and voluntary.

After Jefferson stated he wanted to cancel his attorney and speak to detectives, St. Tammany Parish deputies brought him outside for a break and then into an interview room. Sergeant Hotard, Detective McDowell and Jefferson went into the interview room, and Sergeant Hotard read Jefferson his *Miranda* rights once again, including his right to have a lawyer present for questioning and one appointed for him if he could not afford one.    He executed a written waiver.    Jefferson was fully advised of his rights, indicated that he understood them, and knowingly and voluntarily waived them.[28]    This was Jefferson's second interview with Sergeant Hotard that month.    On May 2, 2012, Jefferson also signed a *Miranda* waiver before speaking to Sergeant Hotard.    He was familiar with the form and his rights under *Miranda*.    The trial court reviewed the initial part of Jefferson's recorded interview in order to judge his demeanor and the officers' actions at the time he waived his *Miranda* rights.    The trial court found that Jefferson looked "fairly comfortable" at the time. The interview lasted several hours, over which time his demeanor changed, and he became emotional; however, the trial court's ruling was based on the first part of the interview at the

---

[28]    State Rec., Vol. 3 of 13, Suppression Hearing (March 31, 2016), pp. 768-69.

time of his *Miranda* waiver.    The state court determined that based on the totality of the circumstances his statement was freely and voluntarily made.    The state court of appeal upheld the trial court's findings under the totality of the circumstances that Jefferson "voluntarily, knowingly and intelligently waived his right to counsel (and silence)."

Jefferson claims that the state court focused on the wrong event (*i.e.*, his interview). According to Jefferson, "the critical question is what was Jefferson's demeanor when he waived his rights in the warrants room."[29]    However, the only time officers testified that his demeanor changed was during the formal interview, not when he was in the warrants office.[30]    Nor were any recording devices even present in the warrants office to capture the conversation between Jefferson and Detective McDowell.    As previously discussed, the determinations surrounding officers scrupulously honoring his rights and Jefferson reinitiating conversation and retracting his intent to proceed with counsel while he was in the warrants office was made based on the officers' testimony during the hearing on the motion to suppress, and factored into the totality of the circumstances.    Jefferson's *Miranda* rights were read to him again after this point and before the interview, and that was the critical time-period for observing his demeanor for the determination surrounding the voluntariness of the waiver.    Based on the Court's review, including consideration of the relevant portion of Jefferson's taped interview, the state court's determination was reasonable.[31]

---

[29]  See Rec. Doc. 3, p. 27.

[30]  State Rec., Vol. 3 of 13, Suppression Hearing (March 31, 2016), p. 765.

[31]  Rec. Docs. 11, 12, Jefferson's May 8, 2012 Recorded Interview.

The state court concluded, based on all the evidence adduced, that no violation occurred under *Edwards* and Jefferson's post-invocation-of-counsel *Miranda* waiver was knowing, intelligent and voluntary.    Because petitioner has provided no clear and convincing evidence to rebut the foregoing evidence and the state court's factual findings, there is simply no basis for this Court to conclude that the state court acted unreasonably in finding that petitioner's rights were "scrupulously honored" and that he validly waived his rights when making the statements.    That determination is a reasonable one based on the record, and it was neither contrary to nor an objectively unreasonable application of the Supreme Court precedents discussed above.    The claim does not warrant federal *habeas* relief.

B.    *Validity of Alford Guilty Plea*

Jefferson asserts that his guilty plea is invalid because "(1) he consistently maintained his innocence; (2) his so-called best-interest plea runs afoul of *Alford* because 'he had absolutely nothing to gain' when he pleaded guilty as charged to second-degree murder and received a life sentence and (3) his attorneys gave unreasonable advice under the facts of this case."[32]    He argues that the plea was not a voluntary and intelligent choice among the alternative courses of action open to him because he had no opportunity to limit the possible penalty by pleading guilty.

This post-conviction claim for relief was denied by the state district court upon full consideration of the background procedural history of Jefferson's case and the relevant applicable law:

The record shows Jefferson was charged by grand jury indictment with the

---

[32]    Rec. Doc. 3, p. 29 (citation omitted).

second degree murder of his ex-wife, Nicole Jefferson, a violation of La. R.S. 14:30.1.    The petitioner pleaded not guilty to the charge.    He filed a pretrial motion to suppress his statements to authorities at the time of his arrest, among other pretrial motions.    A hearing was held on the suppression matter and the motion was denied.

After two days of jury selection and two days into the presentation of the state's case-in-chief, Jefferson withdrew his not guilty plea.    At a *Boykin* hearing, he entered a guilty plea pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), maintaining his innocence with this "best interests" plea, and reserving his right to appeal pretrial rulings under *State v. Crosby*, 338 So.2d 584 (La. 1976).    The Court accepted the plea and sentenced Jefferson to the statutorily-mandated sentence of life imprisonment, without benefit of parole, probation or suspension of sentence.

Pursuant to his *Crosby* reservation, Jefferson appealed the Court's pretrial denial of his motion to suppress his statements.    After review, the appellate court affirmed the evidentiary ruling of the Court and affirmed the petitioner's conviction and sentence.    A writ of review was denied thereafter by the Louisiana Supreme Court.    *State v. Jefferson*, 2018-0083 (La. App. 1 Cir. 9/24/18); 261 So.3d 793, *writ denied* 2018-1671 (La. 2/25/19); 266 So.3d 294 (Mem.).

Jefferson now files an application for post-conviction relief raising two claims. He asserts: (1) his plea was unconstitutional, as the guilty plea was not voluntarily, intelligently or knowingly entered; and (2) he was denied the effective assistance of counsel.    The Court will address each of these claims separately.

*Constitutionality of Guilty Plea*

Jefferson claims his guilty plea under *Alford* was unconstitutional because he gained nothing by pleading guilty as charged to second degree murder and receiving a life sentence.    He maintains that his plea was not a voluntary and intelligent choice among alternative courses of action which were open to him. He argues that if he had known he would be sentenced to life imprisonment if he were convicted by a jury, he would not have stopped the trial to enter a plea of guilty to receive the exact same sentence.

When a defendant pleads guilty, he normally waives all non-jurisdictional defects in the proceedings leading up to the guilty plea, and precludes review of such defects either by appeal or by seeking post-conviction relief.    *State v. Bell*, 332 So.2d 222, 223 (La. 1976); *State v. Ordon*, 2018-0295, p. 6 (La. App. 5 Cir. 11/7/18), 259 So.3d 620, 626.    A "best interest" plea, or *Alford* plea, "is one in which the defendant pleads guilty while maintaining his innocence... According to *Alford*, a defendant may plead guilty, without foregoing his

protestations of innocence, if 'the plea represents a voluntary and intelligent choice among the alternative courses of action open to defendant especially where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage.' " *Ordon*, 2018-0295, p. 7, 259 So.3d at 626-27 (citations omitted).    In order to accept a guilty plea under *Alford*, "constitutional due process requires that the record contain strong evidence of guilt." *Ordon*, 2018-0295, p. 7, 259 So.3d at 627. "Once a defendant is sentenced, only those guilty pleas that are constitutionally infirm may be withdrawn by appeal or post-conviction relief... A guilty plea is constitutionally infirm if it is not entered freely and voluntarily, if the *Boykin* colloquy is inadequate, or when a defendant is induced to enter the plea by a plea bargain, or what he justifiably believes was a plea bargain, and that bargain is not kept." *Id*., 2018-0295, p. 9, 259 So.3d at 627-28.

The record shows that on June 5, 2017, Jefferson's trial began with jury selection on the charge of second degree murder of Jefferson's ex-wife, Nicole. Jury selection encompassed two days, June 5 and 6, 2017.    On June 7, 2017, the state began to call witnesses, elicit testimony and produce evidence that was placed into the court's record.    On June 8, 2017, the state continued to present its case.    At the end of the day on June 8, 2017, the state had already called 9 witnesses and had introduced almost 60 items of evidence.

On the morning of June 9, 2017, the state and defense counsel began the day by discussing a stipulation about some *Prieur* evidence, outside of the jury's presence.    The stipulation detailed the history of violence perpetrated by Jefferson against Nicole, spanning from 2001 to 2010, before, during and after their marriage.    *See* Vol. 3, p. 574-575A.    After the stipulation was entered into the record, the state identified the witnesses who would be called that morning and indicated "... from here on out kind of going in order of events starting from April 29th."    R. Vol. 5, p. 1244.    Defense counsel told the judge, in answer to the judge's question, that there was nothing else that needed to be placed on the record outside the jury's presence.    *Id*.

Just as the judge was about to call for the jury, defense counsel indicated there was something else to address, and counsel approached for a bench conference.    *Id*.    Although not placed on the record at that point, the undersigned, who is the same judge who presided over the trial, is aware that defense counsel approached the bench to disclose that Jefferson had just informed his counsel that he wanted to enter an *Alford* guilty plea to the charge.    Thereafter, the record indicates that the prosecutors requested time to speak with the family of the victim and their office.    *Id*., p. 1244-1245. Defense counsel then announced Jefferson's intention to enter a plea of guilty to the charge of second degree murder under *North Carolina v. Alford*, reserving his right to appeal pretrial evidentiary rulings under *State v. Crosby*, *supra*.    *Id*., p. 1246.

The state strenuously objected to Jefferson's intention to enter a "best interests" plea of guilty and the prosecutor made the following statement for the record:

> ... It's our understanding the defendant, Calvin Jefferson, would like to plead guilty as charged pursuant to *North Carolina v. Alford*, the State recognizes that we cannot stop the plea under *Alford*, we would if we could, the case law is clear that it is up to the Judge, that you have the power to stop him from essentially maintaining his innocence. The State believes that we have presented a mountain of evidence that Your Honor has heard over the last couple of days and it is abundantly clear that on April 29, 2012, Calvin Jefferson murdered Nicole Jefferson and then dumped her lifeless body on the side of the Interstate.
> The family who is all present ask you to take note of that. They are strenuously and morally opposed as well as the District Attorney's office to Your Honor allowing Calvin Jefferson to sit before everyone and maintain his innocence.
> So we would ask based off those reasons and the overwhelming evidence already presented that you not allow him to plea under *North Carolina v. Alford*. R. Vol. 5, p. 1248-1249.

The Court ruled, as follows:

> Look, I recognize the family's situation at this point and the length of time we have spent in trial. I certainly see that there is sufficient factual basis for a plea, but noting the uncertainties of trial processes and recognizing that Mr. Jefferson all though it would be a plea under *Alford*, the end result of this plea is finality from the perspective of a life sentence and that is what he will have to agree to to accept as part of the plea agreement because that is the mandatory sentence that is [set] forth in the statute... So, I think the end result is the same even though there is a lack of certain language spoken by way of the plea. By that thought my thought is to accept Mr. Jefferson's plea if he chooses to do so and we move forward and hopefully that brings us to some extent that the family in their heart [reaches] some conclusion because that's really what I am looking for for everybody is some conclusion of this ... I have been dealing with this case for all most its full tenure and I know that there is a need for a conclusion. And that's why I am hopeful. I am surprised to be sitting here speaking of this this morning because I did not anticipate this when I walked in here this morning. I think there is some good and some bad to it and I recognize that. So, I am going to note the State's objection as made on the record and if Mr. Jefferson is ready to proceed with the plea, I will accept so. R. Vol. 5, p. 1250-1252.

After ruling on the state's objection, the Court conducted a *Boykin* inquiry with Jefferson, ensuring that the plea was freely given, voluntary and knowing; that Jefferson fully understood the charge of second degree murder brought against him and the penalty he would receive for pleading guilty, that being a sentence of life imprisonment without benefit of parole, probation or suspension of sentence; that Jefferson understood the constitutional rights he was waiving by entering a plea of guilty; that Jefferson was satisfied with the representation of his counsel; that Jefferson understood the nature of the "best interest" plea he was entering; and that the plea was not the result of force, coercion, intimidation, promises or inducement. R. Vol. 5, p. 1253-1259. The waiver of rights form was carefully edited to clarity [sic] that this guilty plea was both an *Alford* plea, and that there was a reservation of Jefferson's right to appeal "any and all issues raised by defense counsel throughout the pendency of the proceeding." R. Vol. 3, p. 576. Jefferson initialed each of the rights he was waiving by pleading guilty. *Id*.

The prosecutor offered as a factual basis for the plea "…all evidence that was told to the jury in opening statement from all witnesses going forward and would present everything that I said in opening statement." R. Vol. 5, p. 1259-1260.    Since Jefferson was maintaining his innocence by entering a guilty plea under *Alford*, defense counsel elected not to join in a stipulation of facts. R. Vol. 5, p. 1259.

The Court indicated judicial notice would be taken of the testimony and evidence solicited thus far and found there to be a sufficient factual basis for the charge to which Jefferson was entering his guilty plea.    R. Vol. 5, p. 1260. The Court accepted Jefferson's plea of guilty, finding: "… that [Jefferson's] plea of guilty is freely, knowingly and voluntarily made without having anyone force, coerce intimidate or induce him to do so.    I find that he has the necessary mental capacity and does in fact understand the crime, the penalty associated therewith and the consequences of his plea."    *Id*.

After review of the record, the Court finds that Jefferson has failed to show any constitutional infirmity with his *Alford* guilty plea.    Jefferson fails to establish he was unaware of either the specific charge against him or of the essential nature of that charge.    To the contrary, the record indicates his plea was entered with a full awareness of the essential nature of the specific charge to which he pleaded guilty and of the sentence of life imprisonment without benefit of parole, probation or suspension of sentence that would be imposed. Further, the record affirmatively shows that Jefferson's "best interests" plea was freely and voluntarily given, comported fully with the requirements of *Boykin*, and was not obtained by any unconstitutional inducement.

Although Jefferson now complains that he "gained nothing" by pleading guilty as charged under *Alford* and receiving a life sentence, the Court notes that Jefferson was allowed to maintain his innocence in the face of substantial

evidence of guilt in the murder of his ex-wife.   In doing so, he prevented the state from presenting that evidence, and evidence of Jefferson's violent past with his ex-wife, before the jury and Jefferson's family, including his children. Moreover, Jefferson was allowed to preserve for review the Court's pretrial rulings on evidentiary matters under *State v. Crosby*, *supra*.   Jefferson exercised this right by taking an appeal and having reviewed a suppression ruling which allowed in evidence his contradictory statements to authorities at the time he was arrested.

The Court does not believe that the validity of an *Alford* plea is limited to situations where there is a reduction in the charge or in the sentence.   The Court believes that whether the guilty plea is in the "best interests" of the defendant may include personal considerations, as here.   The Court holds that Jefferson's current dissatisfaction with the sentence imposed does not negate the fact that his guilty plea under *Alford* was constitutional.   The Court finds that this claim has no merit.[33]

The Louisiana First Circuit Court of Appeal summarily denied the claim.   *State v. Jefferson*, 2019-1558, 2020 WL 789012 (La App. 1 Cir. 2/18/20).   The Louisiana Supreme Court subsequently denied relief without citing additional reasons.   *State v. Jefferson*, 2020-00656 (La. 10/20/2020), 303 So.3d 300.

The Supreme Court in *Alford* reiterated that the proper standard for judging the voluntariness of a plea "was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."   *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (citing *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)).   The Court further explained:

[W]hile most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime. Nor can we perceive any material difference between

---

[33]  State Rec., Vol. 11 of 13, State District Court PCR Judgment.

> a plea that refuses to admit commission of the criminal act and a plea
> containing a protestation of innocence when, as in the instant case, a
> defendant intelligently concludes that his interests require entry of a guilty
> plea and the record before the judge contains strong evidence of actual guilt.

*Alford*, 400 U.S. at 37 ("That he would not have pleaded except for the opportunity to limit the possible penalty does not necessarily demonstrate that the plea of guilty was not the product of a free and rational choice, especially where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage.").

Jefferson argues that the state court unreasonably applied controlling precedent. The facts here differ from *Alford*, where defendant received a reduced sentence by maintaining his innocence but entering a plea of guilty to second-degree murder, rather than facing a possible death sentence if convicted by a jury of first-degree murder. No plea bargain existed in this case. There was no promise of a reduced sentence. Jefferson recognizes that and he was aware of that fact when he entered his *Alford* plea. However, he now contends that because he pleaded guilty without the possibility of a lesser sentence than life imprisonment, it should be presumed that he obviously remained ignorant about the nature of the charge and made an unintelligent and uninformed choice.[34] Neither the controlling law nor the record itself supports his position. Jefferson cannot demonstrate that the state court determination in this case was contrary to, or resulted from, an unreasonable application of, Supreme Court law.

A guilty plea must be a voluntary, knowing, and intelligent act "done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*,

---

[34] In his traverse, he questions, "how can it be in his best interest to accept that death-by-incarceration sentence under *North Carolina v. Alford.*" Rec. Doc. 10, p. 3.

397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).    Courts consider all relevant circumstances when determining whether a plea was voluntary.    *Id.* at 749.    As the United States Fifth Circuit Court of Appeal has explained:

> "A plea not voluntarily and intelligently made has been obtained in violation of due process and is void." *Matthew v. Johnson*, 201 F.3d 353, 364 (5th Cir. 2000) (citing *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969)). For a plea to be knowing and voluntary, a defendant must know the "direct consequences of the plea," *Duke v. Cockrell*, 292 F.3d 414, 416 (5th Cir. 2002), "including the nature of the constitutional protection he is waiving," *Matthew*, 201 F.3d at 365. In assessing whether a defendant's plea is valid, we "look to 'all of the relevant circumstances surrounding it.' " *Matthew*, 201 F.3d at 364-65 (quoting *Brady v. United States*, 397 U.S. 742, 749, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)).

*Vollmer v. Davis*, 673 F. App'x 406, 411-12 (5th Cir. 2016).

Here, the record reasonably supports the state court determination that Jefferson's decision to plead guilty was knowing, intelligent and voluntary.    Several days into trial, Jefferson decided he wanted to plead guilty as charged under *Alford*, while reserving his rights under *Crosby* to challenge pretrial rulings.    After extensive discussions with counsel, he executed a written guilty plea form modified to reflect the reservation of rights and *Alford* plea.[35]    A plea colloquy took place on the record.[36]    Defense counsel informed the court that Jefferson wished to change his plea to guilty as charged under *Alford*.    The trial court set forth the second-degree murder charge to which he was pleading guilty and explained the maximum penalty associated with the charge.    Jefferson stated he fully understood the constitutional rights explained to him by his counsel and the trial court, and the fact that he

---

[35]    State Rec., Vol. 3 of 13, "*Alford* Plea/*Crosby* Plea" Plea of Guilty and Waiver of Rights form executed June 9, 2017.

[36]    State Rec., Vol. 5 of 13, R.p. 1240, Transcript of June 9, 2017 (Change of Plea), p. 1253 (*Boykin*).

was waiving those rights by pleading guilty (with the exceptions noted), including the right to trial by jury, the right to confront and cross-examine his accusers, and the right against self-incrimination.    He said that no one was forcing him to plead guilty and that no one had promised him anything to induce his plea.    He stated that he understood under *Alford* that he was entering a "best interests" plea.    He assured the trial court that he was pleading freely and voluntarily and that he understood the penalty for his crime.

As the trial record confirms, the State's evidence against him was substantial.    The prosecutor referred to it as a "mountain of evidence" presented over the last few days that makes it abundantly clear that he murdered his ex-wife.[37]    The State intended to call between 30 and 40 witnesses for trial.[38]    The state prosecutor offered a stipulation of the facts as asserted in its opening statement, but the defense declined to join that stipulation. Instead, the prosecution stated that it would rely on the record of the trial, and the trial court agreed that it could certainly take judicial notice of the testimony and evidence elicited up to that point, finding a sufficient factual basis for the charge of second-degree murder.    The defense did not object to this finding based on the record evidence.    The court accepted his guilty plea as knowingly, intelligently and freely entered.    The trial court heard victim impact statements and then sentenced Jefferson pursuant to his guilty plea to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.

There was certainly no pressure put on Jefferson to take the guilty plea, which was accepted by the trial court over the State's objection.    It was a "best interests" plea initiated

---

[37]   State Rec., Vol. 5 of 13, Trial Transcript (Change of Plea), p. 1249.

[38]   State Rec., Vol. 4 of 13, Trial Transcript, p. 972 (State's Opening Statement),

by Jefferson to allow him to maintain his innocence, and to end the trial quickly before the state presented any more witnesses or evidence, including evidence of his lengthy history of physically abusing Nicole.    The state district court on post-conviction reasoned that "whether the guilty plea is in the 'best interests' of the defendant may include personal considerations, as here."    The Court likewise agrees that these personal considerations are no less tangible than a reduced sentence when a fully informed defendant represented by counsel believes those factors weigh strongly in favor of a "best interests" plea and being able to control the outcome of his own case considering he was facing near certain conviction as charged on the mountain of evidence the State had to prove his guilt at trial.    *See* Anne D. Gooch, Note, *Admitting Guilt by Professing Innocence: When Sentence Enhancements Based on Alford Pleas Are Unconstitutional*, 63 Vand. L. Rev. 1755, 1763-65 (2010) (noting that *Alford* pleas allow defendants to have some control over the next steps and gives them certainty over the outcome of their cases, avoid the shame of admitting guilt in especially sensitive or painful contexts, such as sex abuse cases, citing Professor Stephanos Bibas's survey,[39] and reduces the incentive for criminal defendants to lie and thereby alleviates their attorney's ethical concerns").[40]    More importantly, Jefferson cites no federal

---

[39] Stephanos Bibas, *Harmonizing Substantive-Criminal-Law Values and Criminal Procedure: The Case of Alford and Nolo Contendere Pleas*, 88 Cornell L. Rev. 1361, 1378 (2003).

[40] The Supreme Court has discussed motivating factors for guilty pleas attributable not only to the State, but the criminal process itself:

> The State to some degree encourages pleas of guilty at every important step in the criminal process. For some people, their breach of a State's law is alone sufficient reason for surrendering themselves and accepting punishment. For others, apprehension and charge, both threatening acts by the Government, jar them into admitting their guilt. In still other cases, the post-indictment accumulation of evidence may convince the defendant and his counsel that a

controlling law that holds, for *Alford* pleas to be constitutionally valid, the defendant must obtain a lesser sentence.    Indeed, the United States Fifth Circuit Court of Appeal has expressly rejected this notion.    *See United States v. Szucko*, 9 F.3d 103, 1993 WL 481583 (5th Cir. 1993) (recognizing that defendant felt it was advantageous to make an *Alford* plea even without an accompanying reduction in his sentence and rejecting the claim that his plea was not voluntary unless he received a lesser sentence in exchange for his plea).

Accordingly, for the reasons stated, Jefferson has not shown that the state court's denial of relief on this issue was contrary to, or an unreasonable application of, clearly established federal law.    The claim does not warrant federal habeas corpus relief.

C.    *Ineffective Assistance of Counsel*

In a related claim, Jefferson asserts that he was denied the effective assistance of counsel when he advised him to plead guilty under *Alford* without the opportunity to limit the possible penalty, which amounted to "death by incarceration."[41]    He claims that he was not properly informed by counsel, and had he known he would have been sentenced to life imprisonment if convicted by a jury, he would not have stopped the trial and entered a plea of guilty to receive the same sentence.

The ineffective-assistance-of-counsel claim was rejected on the merits by the state courts during post-conviction review.    In denying the claim, the state district court set forth

---

trial is not worth the agony and expense to the defendant and his family. All these pleas of guilty are valid in spite of the State's responsibility for some of the factors motivating the pleas.

*Brady*, 397 U.S. at 750.

[41]   Rec. Doc. 3, pp. 33-34.

the controlling federal law under *Strickland v. Washington*, 466 U.S. 668 (1984) and *Hill v.*

*Lockhart*, 474 U.S. 52 (1985), and reasoned:

> The record belies Jefferson's claims. Although Jefferson contends that an evidentiary hearing is needed to determine how the decision to plead arose, the Court finds the record answers that question. Jefferson was defended by Kevin Linder and Chanel Smith. On the day the plea was entered, defense counsel appeared for the third day of defending Jefferson against the state's case-in-chief. They worked out a stipulation with the state on other crimes evidence that, by the Court's own pronouncement, was "... really not going to be an issue at least until later in the day." R. Vol. 5, p. 1244. Lead defense counsel had just stated the defense was prepared to have the jury brought in and to start the day's testimony. *Id*. Clearly, defense counsel was not anticipating that the petitioner was going to change his mind and plead guilty until Jefferson told them he was.
>
> Once Jefferson told defense counsel of his decision to plead guilty while maintaining his innocence, defense counsel informed the Court and the state of Jefferson's decision. The state indicated on the record its need to address the matter with the family of the victim and the District Attorney's Office. R. Vol. 5, p. 1244. When the state argued that the defense had to declare with specificity exactly which pretrial ruling the defense was reserving in its *Crosby* reservation, defense counsel asked the Court for leave to supplement when they determined which pretrial rulings would be appealed. Defense counsel indicated they were unable to declare, at that time, the precise parameters of their *Crosby* reservation. R. Vol. 5, p. 1247.

The Court agreed with defense counsel:

> As noted by defense counsel this has been going on for years and I can't even count on both hands how many rulings I have made, evidentiary wise pre-trial rulings with regard to admissibility of evidence and *Prieur* things of that nature. I don't know if that can be done in five minutes. I mean, obviously, this is not something that I anticipated when I walked into court this morning that we were going to be doing this. R. Vol. 5, p. 1247-1248.

Defense counsel responded: "It was not our expectation." R. Vol. 5, p. 1248. The Court finds that these statements show that the decision to plead guilty under *Alford* was Jefferson's decision, communicated to his defense counsel that morning.

> As to his specific complaints, the Court finds the record shows them to be without merit. The record shows that several breaks were taken, during which defense counsel spoke with their client. Jefferson responded to the Court's

questioning during his *Boykin* colloquy by affirming that he understood the nature of the charge against him, *i.e.*, second degree murder. R. Vol. 5, p. 1254. To ensure that he was aware, the Court read the statutory definition of the charge, as well as the statutory penalty of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. R. Vol. 5, p. 1254-1255. Jefferson answered affirmatively that he understood the nature of the charge and its penalty. *Id.* and R. Vol. 5, p. 1257. The Court confirmed with Jefferson that Jefferson was entering a "best interests" plea under *Alford*, and that Jefferson was preserving his right to appeal pretrial rulings under *Crosby*. R. Vol. 5, p. 1257. Both of Jefferson's defense counsel affirmed that they had discussed with Jefferson his constitutional rights and their belief that Jefferson fully understood his constitutional rights. In fact, Jefferson's lead counsel indicated there had been "extensive decisions [sic; discussions], Your Honor, and yes, we do." R. Vol. 5, p. 1258.

If defense counsel failed to inform Jefferson about the sentence he would receive, the record shows the Court informed Jefferson that he would receive a sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence on several occasions, both before the *Boykin* colloquy and during questioning. Jefferson has not shown that counsel rendered deficient performance in this regard. Even if he could, the Court finds that Jefferson cannot show prejudice, as he was informed by the Court on several occasions of the penalty he would receive after pleading guilty.

The Court finds that Jefferson fails to show that his counsel did not discuss with him the nature of the *Alford* plea. Defense counsel stated there were extensive discussions undertaken that morning with Jefferson, after he indicated his desire to plead guilty while maintaining his innocence. Even if Jefferson could show that counsel rendered deficient performance in this regard, the Court notes that Jefferson cannot show how he was prejudiced, when Jefferson was present in court when the prosecutor entered his strenuous objection on the record to Jefferson's decision to maintain his innocence while pleading guilty and the Court's discussion regarding that point. Failing to show either prong of the *Strickland* analysis, Jefferson fails to show entitlement to post-conviction relief on this claim.[42]

The Louisiana First Circuit Court of Appeal summarily denied the claim.   *State v. Jefferson*, 2019-1558, 2020 WL 789012 (La App. 1 Cir. 2/18/20).   The Louisiana Supreme Court subsequently denied relief without citing additional reasons.   *State v. Jefferson*, 2020-

---

[42]   State Rec., Vol. 11 of 13, State District Court PCR Judgment.

00656 (La. 10/20/2020), 303 So.3d 300.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. The two-part *Strickland* test applies to challenges to guilty pleas based on ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S. Ct. 366, 88 L.Ed.2d 203 (1985). Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e.* deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must

overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.    *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."    *Strickland*, 466 U.S. at 694.    In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.    In order to satisfy the "prejudice" requirement in the guilty plea context, a petitioner must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.    *Hill*, 474 U.S. at 58–59.

Because the claims were adjudicated on the merits in state court, habeas relief is available only if that adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.    28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86 (2011).    "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."    *Richter*, 562 U.S. at 105 (citations omitted).    The Supreme Court has stressed, in no uncertain terms, that "a federal court may grant relief only if *every* " 'fairminded juris[t]' " would agree that *every* reasonable lawyer would have made a different decision.    *Dunn v. Reeves*, 141 S.Ct. 2405 (2021) (citing *Richter*, 562 U.S. at 101, 131 S.Ct. 770).

Underlying Jefferson's twofold claims that his guilty plea was involuntary and counsel performed deficiently during plea negotiations is his misguided assertion that he gained nothing from entering the plea, which is simply not true.    As set forth above in the district

36

court's reasons and reasonably supported by the record, it was Jefferson who asked to plead guilty.    Even though he was not offered a lesser charge or sentence, Jefferson's guilty plea under the circumstances was still advantageous.    He informed his defense counsel that he wanted to plead guilty days into his second-degree murder trial, knowing full well the benefits of doing so at that time.    By entering the plea, the trial would end before the prosecution had the opportunity to put forth any more witnesses and any evidence showing years of physical abuse his ex-wife suffered at his hands, and he could not admit guilt, maintain his innocence on the charge that he murdered his ex-wife, the mother of his four young children, and still be able to appeal any adverse pretrial rulings.

Not only did Jefferson choose to plead guilty, but he did so fully aware of the impact of such a plea.    Counsel confirmed they had extensive discussions with Jefferson about the "best interests" plea, and Jefferson stated on the record not only that he understood the *Alford* plea, but he was satisfied with defense counsels' representation.    Jefferson went forward with his plea despite knowing how strongly the State and the victim's family disagreed with him being allowed to enter the guilty plea, an undeniable indicator that it served Jefferson's best interests.    He heard all the reasons outlined by the state prosecutor on behalf of the victim's family to reject the guilty plea.    Furthermore, during the plea colloquy, the trial judge informed him of the <u>mandatory</u> life sentence for second-degree murder and he acknowledged he understood the penalty he faced, contrary to his current assertion that he would not have entered the guilty plea to receive the same sentence. Thus, even if defense counsel had not thoroughly discussed the penalty he faced in the context of the trial and his *Alford* plea, the trial court did so and ensured Jefferson understood before he accepted the guilty plea.

For these reasons, Jefferson fails to show that his defense counsel performed deficiently in negotiating the *Alford* plea on his behalf and at his own request, considering it was in Jefferson's best interests for tangible personal considerations other than a reduced sentence, in light of the strong evidence of his guilt and virtual certainty he would be found guilty as charged at trial.    Nor has he shown that but for counsels' alleged failure to advise him that he was facing the same mandatory life sentence whether he went to trial or entered an *Alford* plea, that there is a reasonable probability he would not have pleaded guilty and would have insisted on going to trial.

In summary, Jefferson has not shown that the state-court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.    Accordingly, under the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

<u>**RECOMMENDATION**</u>

For the foregoing reasons, it is **RECOMMENDED** that Jefferson's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United*

*Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[43]

New Orleans, Louisiana, this __1st__ day of __December__, 2021.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[43] *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.